**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# 11 CIV 7960

| | |
|---|---|
| ERNESTO ESPINOZA, Individually and On Behalf of Himself and All Others Similarly Situated, | X<br>:  Case No.<br>: |
| Plaintiff, | :  CLASS ACTION COMPLAINT FOR<br>:  VIOLATIONS OF THE FEDERAL<br>:  SECURITIES LAWS |
| v. | : |
| JON S. CORZINE, HENRI J. STEENKAMP, BRADLEY I. ABELOW, and MICHAEL G. STOCKMAN, | :<br>:<br>: |
| Defendants. | : |
| | X **JURY TRIAL DEMANDED** |

Plaintiff, Ernesto Espinoza, by his undersigned attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through plaintiff's counsel, which included, among other things, a review of Defendants' (as defined herein) public documents, conference calls, announcements issued by MF Global Holdings Ltd. ("MF Global" or the "Company"), wire and press releases published by and regarding the Company, advisories about the Company, and other information readily obtainable on the internet.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired MF Global common stock between May 19, 2011 and October 28, 2011, inclusive (the "Class Period") for violations of the U.S. Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

2.      MF Global was one of the world's leading brokers in markets for commodities and listed derivatives. The Company provided access to more than seventy exchanges globally and was a leader by volume on many of the world's largest derivatives exchanges. It also was an active broker-dealer in markets for commodities, fixed income securities, equities, and foreign exchange and was one of twenty primary dealers authorized to trade U.S. government securities with the Federal Reserve Bank of New York. The majority of the Company's revenues were derived from three main sources: (i) commissions generated from execution and clearing services; (ii) principal transactions revenue, generated both from client facilitation and proprietary activities; and (iii) net interest income from cash balances in client accounts maintained to meet margin requirements as well as interest related to its collateralized financing arrangements and principal transactions activities.

3.      Throughout the Class Period, MF Global and its most senior officers and directors continuously touted the Company's internal financial controls and its liquidity levels. However, as investors began to learn on October 24, 2011, those statements were knowingly false and

misleading. For example, between October 24, 2011 and October 27, 2011, the three largest rating agencies in the United States - Moody's Investors Service ("Moody's"), Standard & Poor's ("S&P"), and Fitch Ratings ("Fitch") - threatened and/or dramatically lowered the Company's credit ratings to nearly junk status (and, in the case of Fitch and Moody's, actual junk status). Following the downgrades, on October 27, 2011, it was reported that MF Global's senior officers attempted to spin off the Company's futures trading business. The attempt to spin off the division, however, failed and on October 31, 2011, MF Global shocked investors and filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York. All said, investors lost approximately $585 million in market capitalization in a single week.

## II.    JURISDICTION AND VENUE

4.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

7.    In connection with the acts alleged herein, Defendants, directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

8.    Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased MF Global common stock during the Class Period and has been damaged thereby.

9.      Defendant Jon Corzine ("Corzine") served as MF Global's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") from March 23, 2010 until November 4, 2011.

10.     Defendant Henri J. Steenkamp ("Steenkamp") served as the Company's Chief Financial Officer ("CFO") beginning in April 2011. Prior to becoming CFO, Steenkamp was the Company's Chief Accounting Officer and Global Controller.

11.     Defendant Bradley I. Abelow ("Abelow") served as the Company's President beginning in March 2011 and its Chief Operating Officer from September 2010.

12.     Defendant Michael G. Stockman ("Stockman") served as the Company's Chief Risk Officer beginning in January 2011.

13.     Defendants Corzine, Steenkamp, Stockman, and Abelow are collectively referred to herein as the "Defendants".

14.     MF Global is an interested party in this litigation and is not named as a defendant herein because of the automatic stay provision pursuant to Section 362 of the U.S. Bankruptcy Code.

15.     Because of the Defendants' positions with the Company, they had access to the undisclosed information about MF Global's business, operations, operational trends, financial statements, markets, present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

16.     As officers and directors of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business,

markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.    Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

18.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MF Global common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding MF Global's business, operations, management, and the intrinsic value of its common stock; and (ii) caused plaintiff and other shareholders to purchase MF Global common stock at artificially inflated prices.

## IV.    CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased or otherwise acquired the common stock of MF Global during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

20.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MF Global common shares were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.

21.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

22.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of MF Global; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

24.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   False and Misleading Statements

25.    The Class Period in this action begins on May 19, 2011.  On that day, the Company held a conference call with analysts to discuss the Company's fourth quarter earnings. During the conference call, defendant Steenkamp falsely stated:

> As Jon mentioned, we saw principal trading opportunities in European sovereigns this quarter. By entering into resell and repurchase transactions to maturity, as we do in US government securities, we are able to capture arbitrage opportunities in these markets. *We believe the market risk to these trades is minimal, as these are held to maturity*. While we retain exposure to the underlying credit throughout the maturity period, the duration of these trades is short-term in nature. Additionally, we continue to reshape the balance sheet to capture higher margin opportunities, and as such, our matched repo and stockpile loan book continues to move lower. You can see in row 13, our average balances for the repo and stockpile alone book were reduced by 55% over the past year, and 6% from the December quarter. As the incremental returns in this area continue to remain relatively low, we have reduced our lower yielding match book.

26.    Then, on May 20, 2011, MF Global filed its Form 10-K ("2010 Form 10-K") with the SEC and announced its financial results for its fiscal year 2010. The 2010 Form 10-K falsely stated, in part, as follows:

Risk Management

We believe that effective risk management is critical to the success of our business and is the responsibility of all of our employees. All of our employees are risk managers. Employees are expected and encouraged to escalate incidents and any matters of concern to management and to our compliance and risk departments in order to effectively manage risk. *Consequently, we have established—and continue to evolve and improve—a global enterprise wide risk management framework that is intended to manage all aspects of our risks. The risk-management framework is designed to establish a global, robust risk management environment through a strong governance structure that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.*

We seek to identify, assess, measure, monitor and limit market, credit and operational risks across our businesses. Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing our ability to profit from our revenue-generating activities with our exposure to

potential losses. Working with the business areas, the Risk department serves as an advisor and facilitates operation within established risk tolerances while seeking to provide acceptable risk-adjusted returns in a controlled manner. Risk department teams also regularly communicate with our regional officers and to local decision-making bodies to allow us to react rapidly to address any developing risks.

*Our Chief Risk Officer, who reports to our President and Chief Operating Officer, leads the risk department and monitors and reports on our risk matters, including regular reports to our Board of Directors and Audit and Risk Committee. The Chief Risk Officer promotes company-wide adherence to MF Global's enterprise risk management framework and has global responsibility for monitoring and facilitating control of market, credit and operational risks.*

*Senior management takes an active role in the risk management process and expects employees to understand and comply with their delegated risk responsibilities, relevant risk policies, and compliance requirements. Additionally, employees are expected and encouraged to escalate risk incidents and any matters of concern to management in accordance with our internal escalation policy to promote timely risk-mitigation action by the appropriate personnel.*

Reports detail global risk exposures and escalate risks that exceed defined thresholds. *Our risk reporting process is designed to enable us to assess the levels of risk present throughout our operating environment and to take any necessary remedial action in a timely manner. As part of this reporting process, risk reports detailing global risk exposures and escalating risks that exceed defined thresholds are regularly generated.*

\* \* \*

We have multiple sources of liquidity. *We expect our primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations. Subject to the discussion below regarding our changing liquidity needs as a result of the implementation of our strategic plan, we believe we will have sufficient liquidity to meet these obligations given our expected cash flows from operations and our available sources of liquidity.* Our available sources of liquidity as of March 31, 2011 included: (i) our committed $1,200.9 million unsecured revolving liquidity facility with various banks, which we refer to as our "liquidity facility", of which $511.3 million terminates in June 2012 and $689.6 million terminates in June 2014, and under which we currently have $367.0 million outstanding and $833.9 million that is undrawn under this facility at March 31, 2011, (which includes $75.0 million drawn in March 2011 for the purposes of prudent liquidity management and subsequently repaid in April 2011); (ii) available excess capital in our regulated subsidiaries, the withdrawal of which is subject to regulatory approval; and (iii) available excess cash held in the bank accounts of non-regulated subsidiaries. ... In addition, we

have customer collateral that is not included on our balance sheet but can be re hypothecated by us, and non-segregated customer payables, both of which may be considered (depending, among other things, on where the collateral is located and the regulatory rules applicable to the collateral) an additional layer of liquidity. Non-segregated customer cash in some jurisdictions is also available for other client liquidity demands which helps mitigate the use of our own cash. We also rely on uncommitted lines of credit from multiple sources to fund our day-to-day execution and clearing operations.

* * *

We have satisfied our primary requirements for working capital in the past from internally generated cash flow, offering of Common Stock, issuance of convertible debt and other available funds. ***We believe that our current working capital is more than sufficient for our present requirements.*** In OTC or on exchange traded transactions, the amount of collateral we post is based upon our credit rating. Pursuant to our trading agreements with certain liquidity providers, if our credit rating falls, the amount of collateral we are required to post may increase. Some of the factors that could lead to a downgrade in our credit rating have been described in reports issued by certain of the rating agencies, and these factors include, but are not limited to, our profitability each quarter as compared against rating agency expectations, whether we suffer material principal losses, our ability to maintain a conservative liquidity profile, our ability to maintain the value of our franchise, deterioration in our trading volumes or operating cash flows, our ability to implement our strategic plan, a decline in maintenance margin funds or excess capital levels at our regulated subsidiaries and increases in leverage. ***We maintain investment grade ratings from all three rating agencies.***

* * *

***As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events.*** Similarly, for our brokerage activities in the OTC markets involving transactions when we act as principal rather than as agent, we have adopted a futures-style margin methodology to protect us against price movements. A futures-style margin methodology allows us to reduce the amount of capital required to conduct this type of business because we are able to post client deposits, rather than our own funds, with clearing organizations or other counterparties, if required. In determining our required capital levels, we also consider the potential for counterparty default on a large transaction, which would require liquidity to cover such default, or a settlement failure due to mismatched settlement instructions. In many cases, other stock or securities can be pledged as collateral for secured lending to guard against such failure. As a result, we are able to execute a substantial volume of transactions without the need for large amounts of working capital.

* * *

**Management's Report on Internal Control over Financial Reporting**

Management of MF Global Holdings Ltd. together with its consolidated subsidiaries (the "Company"), is responsible for establishing and maintaining adequate internal control over financial reporting.

The Company's internal control over financial reporting is a process designed under the supervision of the Company's principal executive and principal financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States of America.

*The Company's internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of assets; provide reasonable assurances that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures are being made only in accordance with authorizations of management and the directors of the Company; and provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on our financial statements.*

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the effectiveness of the Company's internal control over financial reporting as of March 31, 2011 based on the framework established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has determined that the Company's internal control over financial reporting as of March 31, 2011 was effective and that there were no material weaknesses in the Company's internal control over financial reporting as of that date.

27.   In addition, defendants Corzine and Steenkamp falsely certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), that the Company's internal controls were safe and effective. More specifically, the SOX certifications stated that:

1.  I have reviewed this Annual Report on Form 10-K for the fiscal year ended March 31, 2011 of MF Global Holdings Ltd.;

2   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... for the Registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

28.      Substantially identical certifications were signed by defendants Corzine and Steenkamp in the Company's first quarter 2011 Form 10-Q ("1Q 2011 10-Q").

29.      On August 3, 2011, the Company filed its 1Q 2011 Form 10-Q with the SEC. The 1Q 2011 Form 10-Q falsely stated, in part, as follows:

*In May 2011, for purposes of prudent liquidity management, the Company borrowed $50,000 from the liquidity facility. In March 2011, also for purposes of prudent liquidity management, the Company borrowed $75,000 from the liquidity facility, which was subsequently repaid in April 2011. As of June 30 and March 31, 2011, $342,000 and $367,000, respectively, was outstanding under the liquidity facility with the remainder available to the Company.* The Company has classified the $342,000 of outstanding borrowings at June 30, 2011 under the liquidity facility as short term debt. In connection with the Amendment, the Company paid a one-time fee to participating lenders of $6,818 recorded in Other assets which will be amortized over the life of the facility.

*At June 30, 2011, the Company was in compliance with its covenants under the liquidity facility.*

*        *        *

*The Company conducts its securities and commodities businesses though several regulated subsidiary entities around the world which are subject to the rules and regulations of the applicable local supervisory authorities and principal exchanges of which they are members. These supervisory authorities and exchanges each have defined capital requirements which the respective subsidiaries of the Company are subject to.* The two principal subsidiary entities of the Company conducting such business are MFGI in the U.S. and MF Global UK Limited ("MGFUKL") in the U.K. MFGI, a futures commission merchant and securities broker-dealer, is required to maintain minimum net capital equal to the greater of the amount required by the SEC or CFTC, as defined. At June 30, 2011, MFGI had net capital, as defined, of $570,931, net capital requirements of $399,976, and excess net capital of $170,955.

MFGI is subject to certain notifications and other provisions of the net capital rules of the SEC regarding advances to affiliates, repayments of subordinated

liabilities, dividend payments and other equity withdrawals. *At June 30, 2011, MFGI was in compliance with all of these provisions.*

In accordance with the rules of the FSA in the U.K., the Company's FSA regulated subsidiary, MFGUKL, must comply with the financial resources requirements of the European Union's Capital Requirements Directive. The capital held is intended to absorb unexpected losses and a minimum requirement is calculated in accordance with a standard regulatory formula that addresses the exposure to counterparty credit risk, position/market risk, foreign exchange risk, operational risk and concentration risk. Counterparty risk is calculated as a percentage of unpaid customer margin for exchange traded business and an exposure calculation for off-exchange business. Position risk is calculated by applying percentages to positions based on the underlying instrument and maturity. However, for the purposes of prudential supervision, the Company as a consolidated group, is not subject to the consolidated regulatory capital requirements of the European Union's Capital Requirements Directive.

At June 30, 2011, MFGUKL had financial resources in total, as defined, of $622,110, resource requirements of $438,426, and excess financial resources of $183,684. Regulators may, in addition to setting minimum capital requirements, require that regulated firms hold capital over the minimum amounts as early warning levels to address potential risk which may crystallize in periods of market stress.

*The Company's other regulated subsidiaries are also subject to the respective requirements of other regulatory bodies and exchanges of which they are members in other international locations in which they conduct business. The Company's other regulated subsidiaries were in compliance with all of the respective capital requirements at June 30, 2011 and 2010.*

\* \* \*

The Company provides institutional clients with access to, liquidity in, and insight into commodities, equities, fixed income and foreign exchange, as well as futures and options markets. The Company will build on its strong position in the brokerage business by deepening its involvement in certain markets, by extending its involvement as a principal on a proprietary basis as well as to facilitate more of its client's transactions and widening its range of services. *Although the Company historically has frequently taken a principal position to facilitate clients complete trades and began to increasingly trade for its own account since fiscal 2011, the Company intends to expand its role in market making and principal trading, and to use its capital to trade on a proprietary basis.* In fiscal 2011 the Company established a principal strategies group and expanded its principal trading activities. Over the longer term, the Company intends to complement this expanded role in principal trading by participating in other elements of traditional investment banking, including underwriting new issues of

securities, structuring trades and providing advisory services to issuers, with a continuing focus on the commodities and natural resources markets.

\* \* \*

*The Company has multiple sources of liquidity and expects its primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations. Subject to the discussion below regarding its changing liquidity needs as a result of the implementation of its strategic plan, the Company believes it will have sufficient liquidity to meet these obligations given its expected cash flows from operations and its available sources of liquidity.* The Company's available sources of liquidity as of June 30, 2011 included: (i) its committed $1,200.9 million unsecured revolving liquidity facility with various banks, which the Company refers to as its "liquidity facility", of which $511.3 million terminates in June 2012 and $689.6 million terminates in June 2014, and under which it currently has $342.0 million outstanding and $858.9 million that is undrawn under this facility at June 30, 2011, (which includes $50.0 million drawn in May 2011 for the purposes of prudent liquidity management); (ii) its U.S. regulated broker-dealer subsidiary's committed $300.0 million 364-day secured revolving credit facility, which the Company refers to as its "MFGI secured facility"; (iii) available excess capital in its regulated subsidiaries, the withdrawal of which is subject to regulatory approval; and (iv) available excess cash held in the bank accounts of non-regulated subsidiaries. ... In addition, the Company has customer collateral that is not included on its balance sheet but can be re hypothecated by the Company, and non-segregated customer payables, both of which may be considered (depending, among other things, on where the collateral is located and the regulatory rules applicable to the collateral) an additional layer of liquidity. Non-segregated customer cash in certain jurisdictions is also available for other client liquidity demands which helps mitigate the use of the Company's own cash. The Company also relies on uncommitted lines of credit from multiple sources to fund its day-to-day execution and clearing operations.

\* \* \*

*As a matter of policy, the Company maintains excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events.* Similarly, for its brokerage activities in the OTC markets involving transactions when the Company acts as principal rather than as agent, the Company has adopted a futures-style margin methodology to protect the Company against price movements. A futures-style margin methodology allows the Company to reduce the amount of capital required to conduct this type of business because the Company is able to post client deposits, rather than its own funds, with clearing organizations or other counterparties, if required. In determining its required capital levels, the Company also considers the potential for counterparty default on a large transaction, which would require liquidity to cover such default, or a

settlement failure due to mismatched settlement instructions. In many cases, other stock or securities can be pledged as collateral for secured lending to guard against such failure. As a result, the Company is able to execute a substantial volume of transactions without the need for large amounts of working capital.

Funding for purposes other than working capital requirements, including the financing of acquisitions, has been provided either through internally generated cash flow or through specific long-term financing arrangements.

*   *   *

*The Company's enterprise risk governance framework involves the oversight of its Board of Directors together with the Company's risk oversight committees, policies and procedures, and defined delegation of authority. The Company's Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls, which are designed to ensure its operation within those risk tolerances.*

*The Chief Risk Officer ("CRO"), who reports to the Company's President and Chief Operating Officer, leads the Risk department and is delegated certain authorities from the Board. The CRO reports and advises on market, credit, issuer and operational risk matters. The CRO and senior management promote companywide compliance to its enterprise risk management framework. The CRO is supported by several regional risk officers and a global team to implement the framework.*

*The risk oversight committees monitor and manage risk company-wide and report on risk at the Board and senior management levels. Dedicated committees address various financial, non-financial and regional risks. The Company's senior management leads and actively participates in many of these risk committees. Risk officers are active participants in many strategic and business committees. The Company believes that effective risk management is only possible with effective communication and maintaining an open dialogue between the Board, senior management, business areas, and the Risk department.*

*The enterprise risk management framework employs this governance structure, which is intended to embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which the Company maintains risk within acceptable risk tolerances.* Business areas, pursuant to delegated authority, have primary responsibility for risk management. Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across the Company's businesses. *The internal audit department and audit committee*

*further provide independent control and assurance of the risk-management process.*

\* \* \*

## Regulatory Capital Risk

*The Company's ability to provide clearing services, which is a critical part of its business, depends heavily on its ability to maintain capital at its operating subsidiaries, including equity capital at or above specified minimum levels required by various regulators throughout the world.* Additionally, principal trading activities have higher regulatory capital requirements than agency execution and clearing activities. The Company also needs capital and liquidity to protect the Company against the risk of default by its clearing clients and against clearing and settlement payment delays caused by systemic problems outside its control in one country or between countries. *Various domestic and foreign government regulators, as well as self-regulated organizations (such as exchanges), with supervisory responsibility over its business activities require the Company to maintain specified minimum levels of regulatory capital in its operating subsidiaries.*

*To mitigate this risk, the Company continuously evaluates the levels of regulatory capital at each of its operating subsidiaries and adjusts the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements- Regulatory authorities may increase or decrease these requirements from time to time. The Company also maintains internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and the Company intends to continue to follow this policy. In addition, the Company monitors regulatory developments regarding capital requirements and prepares for increases in the required minimum levels of regulatory capital that may occur in the future.* If not properly monitored and adjusted, its regulatory capital levels could fall below the required minimum amounts set by its regulators, which could expose the Company to various sanctions ranging from fines and censure to partial or complete restrictions on its ability to conduct business.

## Liquidity Risk

*Cash liquidity risk is the risk that, in the normal course of business, the Company would be unable to generate cash resources to meet its payment obligations as they arise. The Company's core business, providing execution and clearing brokerage services, does not generally present substantial cash liquidity risk. However, the Company may be exposed to cash liquidity risk under adverse market conditions or unexpected events from this or its other activities.* The Company relies on uncommitted credit lines to finance its day-to-day clearing operations. Liquidity issues, whether perceived or real, could prompt these lenders to reduce the amount of financing the Company uses to conduct its

clearing operations, which in turn could prompt the Company to reduce the amount of business the Company conducts and could accelerate client withdrawals. The Company must maintain continuous access to adequate and sufficiently liquid sources of capital, including equity capital and external committed facilities on acceptable terms. The Company also must maintain its ability to obtain capital and liquidity on reasonable terms because, if it is only available at a high cost, it could significantly increase its interest expense and impair its earnings.

Under adverse market conditions, cash liquidity risk related to its exchange clearing activity may rise to a level where exchanges may require the Company to satisfy obligations relating to open client positions that exceed the amount of collateral available in its clients' margin accounts. *The Company seeks to mitigate this possibility by observing all relevant exchange margin requirements, and maintaining its own- in many cases more stringent- margin requirements intended to ensure that clients will be able to cover their positions in most reasonably foreseeable economic environments.*

*The Company's policy requires it to have sufficient liquidity to satisfy all of its expected cash needs for at least one year without access to the capital markets.* In June 2007, the Company entered into a $1,500.0 million five-year revolving unsecured credit facility with a syndicate of banks which was amended in June 2010 to extend the lending commitments of certain borrowers and to change the aggregate commitments under the liquidity facility to $1,200.9 million ($858.9 million of which is undrawn at June 30, 2011). In addition, in June 2011 the Company's U.S. regulated broker-dealer subsidiary, MFGI, entered into a $300.0 million 364-day secured revolving credit facility with a syndicate of lenders, all of which is undrawn at June 30, 2011. To support the business' settlement and intraday requirements, the Company also maintains committed and uncommitted credit lines with financial institutions. The Company anticipates accessing these facilities and credit lines from time to time....

*To manage its liquidity risk, the Company has established a liquidity policy designed to ensure that the Company maintains access to sufficient, readily available liquid assets and committed liquidity facilities. These facilities are available to both its unregulated and regulated subsidiaries.* If the Company fails to properly evaluate the impact of adverse market conditions on its liquidity risk and adjust its liquid assets appropriately, the Company may not meet its financial obligations as they become due, under normal or adverse market conditions.

### Operational Risk

### Overview

Operational risk is the risk of loss or other adverse consequence arising from inadequate or failed internal processes, people and systems or from external

events. Consistent with the Company's competitors, its operations are exposed to a broad number of these types of risks which could have a significant impact on its business. The Company further categorizes operational risk as:

- execution, delivery and process management;
- clients, products, and business practices;
- business disruption and systems failures;
- damage to physical assets;
- employment practices and workplace safety;
- financial integrity and reporting;
- internal fraud; and
- external fraud.

Operational risk is inherent in each of the Company's business areas including revenue-generating, support and control activities; therefore, the primary day-to-day responsibility for managing operational risk rests with these areas. Each area has established processes, systems and controls to manage operational risk and is responsible for escalating incidents, issues, and control indicators. *Reports are summarized for senior management and governance committees. Additionally, the Company considers the operational risk in new products, systems, and business activities as they are developed or modified.*

*The Company maintains a continuous and collaborative Operational Risk Management Framework which ensures that an effective environment is in place to identify, assess, measure, monitor and mitigate operational risk across all of its business areas. The Operational Risk Committee, which is chaired by the Global Head of Operational Risk and is a key component of the Enterprise Risk Management Governance structure, provides oversight of the Operational Risk Management Framework and provides a forum for senior management to assess the operational risk profile of the organization. The Global Head of Operational Risk reports to the Chief Risk Officer.* The Operational Risk department is a risk management and assurance function that is independent of the revenue-generating areas. The Operational Risk department's primary objective is to develop, implement, and maintain its Operational Risk Management Framework. *The Operational Risk department works with all business areas to help ensure transparency, awareness, and accountability of risks.*

\* \* \*

*As of the end of the period covered by this report, an evaluation was carried out under the supervision and with the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of its disclosure controls and procedures .... Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures were effective as of and for the period covered by this report. In addition, no change in the Company's internal control over financial reporting ... occurred*

*during its most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, its internal control over financial reporting.*

30.   On September 1, 2011, the Company amended its 1Q 2011 Form 10-Q and falsely stated, in part, as follows:

*As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-l. MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.*

31.   On October 25, 2011, the Company issued a press release announcing its second quarter 2011 financial results. In the release, MF Global falsely stated, in part, as follows:

**Strengthened capital and liquidity position**. As of September 30, 2011, the company has over $3.7 billion in available liquidity, including $1.3 billion in available committed revolving credit facilities and $2.5 billion in total capital.

32.   In addition, defendant Corzine falsely noted that:

Reflecting the stressed markets in the quarter, we deliberately chose to reduce overall market exposure in most principal trading activities *and focused on preserving capital and liquidity* ... We were particularly pleased with the repositioning of our mortgage, credit and foreign exchange businesses; the performance of our commodities group; and the common alignment of our brand to strategy. *These efforts reflect positively on our ability to execute and deliver competitive returns to shareholders in the quarters ahead*.... Over the course of the past year, we have seen opportunities in short-dated European sovereign credit markets and built a fully financed, laddered maturity portfolio that we actively manage. *We remain confident that we have the resources and expertise to*

*continue to successfully manage these exposures to what we believe will be a positive conclusion in December 2012.*

33.     Similarly, in the same release, defendant Steenkamp falsely stated that: "In addition, *the steps we've taken over the past year to improve our capital and liquidity positions are of immense value in periods of uncertainty and volatility. As a result, we are a stronger firm today with more flexibility to focus on our strategy.*"

34.     These statements were materially false and misleading when made because: (1) the Company was suffering from serious liquidity pressures based on its exposure to the European debt crisis; (2) the Company's internal controls were highly deficient and were unable to clearly segregate clients' funds; and (3) Defendants failed to disclose that the Company's true risk profile would inevitably lead to a credit rating downgrade.

**B.     The Truth Begins to Emerge**

35.     On October 24, 2011, Moody's slashed MF Global's credit-rating to Baa3, or nearly junk status, citing the Company's significant risk exposure to European debt.

36.     On this news, the Company's stock price plunged $1.69 per share - from $3.55 per share on October 24, 2011, to close at $1.86 per share on October 25, 2011 - a decline of more than 47% on unusually high volume. Following the downgrade, and in an attempt to lessen the market's reaction, the Company issued a false statement claiming that Company's exposure to European debt was "sound and well-structured."  The Company also claimed that defendant Corzine - a former New Jersey governor and executive at Goldman Sachs - had bolstered MF Global's risk-management practices when he became CEO in March 2010.

37.     Then, during the trading day on October 26, 2011, S&P also threatened to reduce the Company's credit-rating to junk status.

38.     On October 27, 2011, Moody's and Fitch downgraded MF Global's credit-rating to junk status. Fitch released a statement regarding the downgrade that read, in part, as follows:

> In addition, [MF Global's] increase in principal and, to a lesser extent, proprietary trading activities has elevated the firm's traditional risk profile. *These increased risk taking activities have resulted in sizeable concentrated positions relative to the firm's capital base, leaving MF vulnerable to potential credit deterioration*

*and/or significant margin calls.* While Fitch notes that the firm has made some progress in rationalizing its capital structure, *the firm's persistently weak earnings and leverage are no longer consistent with an investment grade financial institution.*

39.    The market reacted swiftly to this news as the Company's stock price fell an additional $0.27 per share - from $1.70 per share on October 26, 2011, to close at an all-time low of $1.43 per share on October 27, 2011 - representing a decline of more than 15% on high trading volume.

40.    On October 31, 2011, MF Global filed for Chapter 11 protection in the U.S. Bankruptcy Court for the Southern District of New York. On November 1, 2011, the NYSE suspended trading of the Company's shares and moved to de-list the Company altogether.

41.    Finally, on November 2, 2011, media outlets reported that the U.S. Department of Justice was investigating MF Global and the disappearance of hundreds of millions of dollars in client funds.

## VI.    LOSS CAUSATION / ECONOMIC LOSS

42.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about MF Global's lack of operational and financial controls was revealed, the Company's common stock declined as the prior artificial inflation came out of its stock price. That decline in MF Global's common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages suffered by plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's common stock price and the

subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

43.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading because they failed to disclose a true and accurate picture of MF Global's business, operations, and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing MF Global's common stock price to be artificially inflated. Plaintiff and other Class members purchased MF Global's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## VII.   NO SAFE HARBOR

44.     The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pled in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of MF Global who knew that those statements were false, misleading, or omitted necessary information when they were made.

## COUNT I
### (Against Defendants)
### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

45.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

46.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

47.    During the Class Period, Defendants, individually and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and course of business which operated as fraud and deceit upon plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase MF Global's common stock during the Class Period at artificially inflated prices.

48.    As a result of the failure to disclose material facts, the information Defendants disseminated to the investing public was materially false and misleading as set forth above, and the market price of MF Global's common stock was artificially inflated during the Class Period. In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, plaintiff and other members of the Class relied, to their detriment, on the integrity of the market price of MF Global's common stock in purchasing shares of the Company. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

49.    Plaintiff and other members of the Class have suffered substantial damages as a result of the unlawful conduct alleged herein in an amount to be proven at trial.

50. By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of MF Global's common stock during the Class Period.

**COUNT II**
**(Against Defendants)**
**Violations of Section 20(a) of the Exchange Act**

51. Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

52. Defendants, by virtue of their positions, stock ownership, and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

53. Defendants had the power and influence - and exercised such power and influence - as to cause MF Global to engage in the unlawful conduct and practices complained of herein.

54. By reason of the conduct alleged in Count I of this Complaint, Defendants are jointly and severally liable to the same extent as the Company for the aforesaid unlawful conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of MF Global common stock during the Class Period.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

A. Determining this action to be a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiff and the other members of the Class against Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

C.      Awarding plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for plaintiff's attorneys and experts;

D.      Granting extraordinary equitable and/or injunctive relief as permitted by law; and

E.      Granting such other and further relief as the Court may deem just and proper.

## IX.     JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 7, 2011                    LAW OFFICES OF THOMAS G. AMON

                                           THOMAS G. AMON

                                           250 West 57th Street, Suite 1316
                                           New York, NY 10107
                                           Telephone: (212) 810-2430
                                           Facsimile: (212) 810-2427

                                           ROBBINS UMEDA LLP
                                           BRIAN J. ROBBINS
                                           GREGORY E. DEL GAIZO
                                           CONRAD B. STEPHENS
                                           600 B Street, Suite 1900
                                           San Diego, CA 92101
                                           Telephone: (619) 525-3990
                                           Facsimile: (619) 525-3991

                                           Attorneys for Plaintiff

670148

- 24 -

### CERTIFICATION OF PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAW

Ernesto Espinoza ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.  Plaintiff has reviewed the Class Action Complaint and has retained Robbins Umeda LLP as counsel in this action for all purposes.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| MF | 10/26/2011 | 500 | 10/26 Purchase | $1.90 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5.  Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: _____

_____

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.  Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7 day of _November_, 2011.

ERNESTO ESPINOZA